GEORGE W. MILTIMORE et al.

v.

CHARLES H. FERRY et al.

*Opinion filed December 22, 1897—Rehearing denied February 3, 1898.*

1. CONTRACTS—*intention of parties must be determined from the contract itself.* The ultimate object in construing a contract is to arrive at the intention of the parties, which intention is to be determined from the contract itself, and not from the previous statements, understandings or agreements of the parties.

2. SAME—*compromise agreement construed as extinguishing a warranty in original contract.* An agreement between a car-wheel company and a wheel tire company to compromise suits arising from the former's refusal to pay for certain tires on account of an alleged breach of a warranty that they should be made of a certain kind of steel, by which the tires are to be delivered at the original price and the tire company is to make good all actual damage sustained by the wheel company by reason of defects in material or manufacture of the tires, extinguishes the original warranty.

3. APPEALS AND ERRORS—*chancellor's finding not disturbed unless clearly against evidence.* The findings of a chancellor upon the testimony of witnesses examined in open court will not be disturbed on appeal, unless clearly against the evidence.

*Ferry v. Miltimore,* 64 Ill. App. 557, affirmed.

WRIT OF ERROR to the Appellate Court for the First District;—heard in that court on appeal from the Circuit Court of Cook county; the Hon. M. F. TULEY, Judge, presiding.

PECK, MILLER & STARR, for plaintiffs in error.

GREEN, ROBBINS & HONORE, for defendants in error.

Mr. JUSTICE CRAIG delivered the opinion of the court:

This writ of error brings up for review the judgment of the Appellate Court for the First District, reversing the decree of the circuit court of Cook county and remanding the case with directions. The suit in the circuit court was a bill filed by George W. Miltimore in October, 1886, against Charles H. Ferry, the Chicago Tire and Spring

Works, the Miltimore Elastic Steel Car-Wheel Company, the Union National Bank and William C. D. Grannis, for an accounting, and to enjoin the enforcement or transfer of certain notes and mortgages given by Miltimore to Ferry. The case was heard before the circuit court upon the original and supplemental bills of complaint as amended, answers thereto, a cross-bill by Ferry and answers thereto and issues thereon, and upon the report of the master to whom the case was referred, and the evidence and exceptions to such report.

In March, 1883, defendant in error the Chicago Tire and Spring Works was a corporation engaged in the county of Cook in the manufacture of car-wheel tires, and the defendant in error Ferry was a stockholder in and the treasurer of the company. On the same date plaintiff in error the Miltimore Elastic Steel Car-Wheel Company was a corporation engaged in the manufacture of car-wheels at Arlington, in the State of Vermont. In this company plaintiff in error Miltimore was vice-president and a large stockholder. On the 23d of March, 1883, the parties made the following contract:

"CHICAGO, *23d March, 1883.*

"*The Chicago Tire and Spring Works:*

"DEAR SIRS—We hereby agree to purchase from you the under-mentioned car-wheel tires, viz.: 100 tires 30 in. outside dia. 2½ in. thick; 600 tires 33 in. outside dia. 2½ in. thick; 300 tires 42 in. outside dia. 2¼ in. thick; price 5¼ cts. per lb. f. o. b. Chicago; terms cash thirty days; deliveries in lots as required, on or before the first day of January, 1884. You have the option of delivering double the quantity and in above proportion at same price and terms.

THE MILTIMORE ELASTIC STEEL CAR-WHEEL CO.

By H. PENNOCK, *President.*"

On the back of the said contract was the following: "Blooms to be of Cammel Manfgr. and Siemens-Martin Steel.—F. M. ATKINSON, *Prest.*"

A short time after the contract was made the number of tires was increased, by agreement, to 3000. After the execution of the contract the tire and spring works began

the manufacture of the tires. It imported from Europe 3000 steel blooms to be used under the contract. As the tires were made they were delivered, from time to time, until, in October, 1884, 1736 tires had been made, of which about 1228 were delivered at the factory of the car-wheel company in Vermont, and 508 at Garfield, Illinois, where Miltimore and Pennock, the president of the car-wheel company, had another car-wheel factory. As the tires were being delivered the wheel company gave to the tire works notes aggregating $20,500, some of which were endorsed by Miltimore and others by Pennock, and all the notes were transferred to Ferry. The notes not having been paid, Ferry instituted suit to enforce payment in the State of Vermont.

After the above suit was instituted the car-wheel company commenced suit in attachment against the tire works to recover $100,000 damages, incurred, as claimed, by breach of warranty and false representation as to the character and quality of the steel from which the tires were made. The claim was, that the tires were warranted "to be first-class steel car-wheel tires and to be made of the best quality of steel for that purpose, and to be equal in quality to the steel car-wheel tire known as the Midvale steel tire or any other first-class steel car-wheel tire," whereas, it is charged, the said tires "were not first-class tires and not made of the best quality of steel for that purpose, but of an inferior quality of steel that was too soft for the purpose of making steel car-wheel tires."

To the action on the notes the car wheel company interposed, in substance, the same defense as is shown by an affidavit filed by Miltimore in that action, as follows: "That said tires should be made of Cammel's best open-hearth steel, and should be of first quality of steel, and as good or better than any open-hearth steel in use; that Cammel's best open-hearth steel was and is known to the trade as a special and superior kind or quality of steel peculiarly adapted to the manufacture of car-wheel

tires, and car-wheel tires made therefrom are superior, giving a larger mileage and strength. And affiant says said tires so sold and delivered by the tire works to said wheel company were not made of Cammel's best open-hearth steel, but of another and inferior kind and quality of steel not adapted to that use, and said tires were of an inferior quality and of poor metal, and gave very small mileage, and were inferior to any open-hearth tire in use, and were not made of open-hearth steel, as affiant believes, and were of little or no value, and if any, of much less value than tires made from Cammel's best open-hearth steel, and of much poorer quality than said tire works promised and agreed, and of much less value than said wheel company paid therefor."

These suits were pending, and a libel suit growing out of the same controversy had been brought. In January, 1885, the parties met in the city of New York, and on or about the 12th day of January, 1885 they made a settlement of the controversies existing between them, and the terms and conditions of the settlement were reduced to writing and signed by the respective parties. The contract contains ten different clauses, but in the view we take of the case it will not be necessary to set out all of them, as the determination of the controversy between the parties depends mainly upon a construction of clauses 2 and 7. The parts of the contract necessary to an understanding of the case are as follows:

"Memorandum of agreement entered into between Charles H. Ferry, party of the first part, the Chicago Tire and Spring Works, party of the second part, the Miltimore Elastic Steel Car-Wheel Company, party of the third part, and George W. Miltimore, party of the fourth part.

"Whereas, the above parties are desirous of settling all suits and differences now existing between them, it is now mutually agreed between them, as follows:

"*First*—The party of the first part agrees to surrender to the party of the third part and party of the fourth part

the following notes executed by the party of the third part and guaranteed by the party of the fourth part:" (Then follows a list of notes, which it will not be necessary to set out here.)

"*Second*—An accounting shall be taken of the steel tires actually delivered by the party of the second part to the party of the third part under contracts executed on or about the 23d day of March, 1883, including 508 33-inch tires hitherto delivered at Garfield, Illinois, which tires shall be surrendered by the party of the second part to the party of .the fourth part f. o. b. Chicago, free from all liens and charges, except the necessary charges of handling and storing the same; also 176 42-inch tires manufactured but not delivered, which shall be delivered by the party of the second part to the party of the fourth part, free from all liens and charges, f. o. b. Chicago. Interest shall be added to the purchase price of the tires delivered, at seven per cent per annum, commencing to run thirty days after date of delivery.   *   *   *

"*Seventh*—If any tires furnished by the party of the second part to the party of the third part or the party of the fourth part shall prove defective in manufacture or quality of material, the party of the second part agrees to make good any expense or loss necessarily incurred by the party of the fourth part in remedying defects in the manufacture of such tires, and to save harmless the party of the third part and party of the fourth part from any claims made by the purchasers of wheels on account of defects in the material or manufacture of such tires.

"*Ninth*—It is agreed that the party of the fourth part, the party of the third part, or any corporation which shall become its successor and carry on the business of the party of the fourth part, shall purchase and take, when manufactured into tires, the balance of the blooms purchased and held by the party of the second part, for the purpose of carrying out the contracts entered into on or about the 23d day of March, 1883, between the party

of the second part and the party of the third part, in such quantities and at such times as the business of said party of the fourth part and party of the third part, or its successor, shall demand; and it is agreed that no other tires shall be used in said business unless specially directed by purchasers of wheels. If any specifications shall be made by purchasers of wheels for other make of tires, the party of the second part shall be notified thereof and given ample opportunity of arranging with such purchaser for the use of tires manufactured out of said blooms."

As has been seen, the original contract of March 23, 1883, under which the tires were purchased, required that the tires should be rolled from steel blooms manufactured by Cammel, of Siemens-Martin steel. It appears from the record that blooms for tires are "rings of steel in the shape of a tire, or in the shape of a cheese or grind-stone, with a hole through the center, in form to be put in rolls and rolled into a tire." It appears from the evidence that about 1228 tires were made and shipped by the tire works to the wheel company at Arlington, Vermont. It also appears that, in addition to the 1228 tires, 508 had been manufactured and shipped to Garfield, where the wheel company had arranged to start a factory, and 176 had been manufactured but not delivered. This was the situation of affairs as to the manufacture and delivery of tires when the compromise agreement was made. The evidence tends to prove, and the master in chancery to whom the cause was referred found, that the tires were not manufactured in conformity to the contract,—that the tires were not all made from "blooms of Cammel manufacture and Siemens-Martin steel." The circuit court, on the hearing, held, in stating the account between the parties as to the 508 tires above specified, and also as to the 176 tires, in all 684, as they were not according to the requirements of the original contract the wheel company should not be charged with them, but as to the 1228 tires which had been delivered the wheel company should be

charged, and should a loss be sustained in the future, the only remedy was under clause 7 of the compromise agreement. The Appellate Court, however, reversed the decree of the circuit court, and held that the defendants in error should be allowed the purchase price of all tires delivered, including the 508 delivered at Garfield and the 176 manufactured and not delivered, and should be charged only with such expense as should be actually incurred and the damages of purchasers sustained, as provided in clause 7 of the compromise agreement.

Whether the Appellate Court is correct depends upon the construction to be placed upon the compromise agreement. In the construction of this contract the ultimate object to be attained is to arrive at the intention of the parties. But that intention is not to be determined from statements made by the parties prior to the execution of the contract or from previous understandings or agreements, but the intention of the contracting parties must be determined from the writing itself, which they executed as their final agreement. The compromise agreement pretends to be a complete contract in itself, professing to settle all matters in dispute between the parties. In the very beginning it declares: "Whereas, the above parties are desirous of settling all suits and differences now existing between them, it is now mutually agreed between them as follows." When this agreement was made it was known by the wheel company that the tires which the defendants in error had made to fill their contract were not made from blooms of Cammel's make and were not of Siemens-Martin steel. In the pending suits, which were settled and to be dismissed, one of the controversies was that the tires did not meet the requirements of the original contract by being made from blooms of Cammel's make and of the quality of Siemens-Martin steel. If the controversy between the parties in regard to the failure of the tires to meet the requirements of the original contract was not to be settled by the compromise agreement,

171—15

and that dispute was to be continued as an open question, surely the parties would have so provided in the compromise agreement, which seems to have been prepared with great care and deliberation. The 684 tires had been manufactured before the compromise agreement was drafted and executed, and if they were not to be delivered and paid for, it is manifest the parties would have declared in their contract that the 684 tires manufactured in compliance with the original contract should not be delivered. But this was not done. On the other hand, by clause 2 it was declared in plain language that an account should be taken of the steel tires actually delivered by the party of the second part, including 508 33-inch tires delivered at Garfield and 176 42-inch tires manufactured but not delivered.

It was held by the circuit court that the warranty contained in the original contract was extinguished by the compromise agreement as to the 1200 or 1400 tires which had been delivered before that contract was executed. If this is so, the warranty was extinguished as to the 684 tires, as both are controlled by the same language in clause 2 of the compromise agreement. If the defendants in error were to be held liable on the warranty contained in the original contract, why, it may be asked, did the compromise agreement provide, as was done in clause 6, that the suits pending to establish the liability of defendants in error for a failure to deliver tires made from blooms of Cammel manufacture and Siemens-Martin steel should be dismissed? If that dispute was not settled there was no reason why the suits should be dismissed. If, on the other hand, the dispute in regard to the make and quality of the steel of the blooms of which the tires were to be made was settled by the compromise agreement, then all suits involving that question should be dismissed, as was provided for in the agreement and as was afterwards done by the parties.

That the dispute was intended to be settled is also made apparent by clause 9 of the compromise agreement, which provides that the wheel company shall purchase and take, when manufactured into tires, the balance of the blooms held by defendants in error for the purpose of carrying out the contract made March 23, 1883. Under clause 2 all tires which had been made at the time the compromise agreement was executed were to be paid for at the price originally agreed upon, and, so far as the business of the wheel company might thereafter demand, the balance of the blooms, when manufactured into tires, were to be taken and paid for, whether they conformed to the requirements of the original contract or not. The object of the parties seems to have been, by the execution of the compromise agreement, to settle by its terms all existing disputes; and in regard to tires which had been delivered and which were thereafter to be delivered, if they did not, in manufacture and quality of steel, conform to the original contract, a new and different mode was provided for adjusting the loss or damage from that which existed under the original contract. This is apparent from the language of clause 7 of the compromise agreement, which is as follows: "If any tires furnished by the party of the second part to the party of the third part or the party of the fourth part shall prove defective in manufacture or quality of material, the party of the second part agrees to make good any expense or loss necessarily incurred by the party of the fourth part in remedying defects in the manufacture of any such tires, and to save harmless the party of the third part and party of the fourth part from any claim made by the purchasers of wheels on account of defects in material or manufacture of such tires." Under this provision of the compromise agreement we think it is manifest that the original contract of March 23, 1883, in so far as it required the tires to be "of Cammel manufacture and Siemens-

Martin steel," was superseded, and the rights of the parties were to be adjusted according to the terms and conditions of the contract of January 12, 1885.

Under the provisions of clause 7 above set out, a liability may arise against the tire works, as said in the brief of defendants in error, in two events: First, when tires are defective in manufacture; and second, when tires are defective in quality of material. As will be observed, the liability is fixed by clause 7 in two events, and after that is provided for it is then determined what the liability shall be. First, the tire works agrees to make good any expense or loss necessarily incurred by the car-wheel company in remedying defects in the manufacture of the tires; second, to save harmless the wheel company and Miltimore from any claims made by the purchasers of wheels on account of defects in the material or manufacture of such tires. Under this clause of the contract, when the wheel company necessarily suffers any expense or loss in remedying defects in the tires, then the tire works will be liable. So, also, when the wheel company shall be required to pay claims made by purchasers of wheels on account of defects in the material or manufacture of tires, then the tire works will be required to make good all such claims.

It is also claimed in the argument that the circuit court erred in not allowing plaintiffs in error for 600 car-wheels alleged to have been sold by Miltimore to the tire works in April, 1886. Upon this question the witnesses were orally examined before the court, and after a full consideration of the evidence the court found against the claim. Where the witnesses are produced and examined in open court, the finding of the court will not be disturbed unless the finding is manifestly and clearly against the evidence. Such was not the case here.

The judgment of the Appellate Court will be affirmed.

*Judgment affirmed.*