## John Featherstone et al. v. Frank Betlejewski.

1. SETTLEMENTS—*Inadequacy of Consideration, a Circumstance Tending to Impeach.*—Where a bill is filed to impeach a settlement of a personal injury suit, gross inadequacy of the amount for which the claim is alleged to have been settled, is a circumstance material to the inquiry whether the settlement was procured by fraud.

2. DECREES—*Not Disturbed Unless Clearly Against the Evidence.*—When the witnesses are produced and examined in open court, the finding of the chancellor will not be disturbed unless it is manifestly and clearly against the evidence.

3. MINORS—*Obligation of, as to Money Received from a Guardian Whose Action is Repudiated.*—On a bill to impeach a settlement, alleging that money paid to the guardian of the complainant during his minority had been expended for the necessaries of life, and that the complainant has no means whatever and is unable to tender back said money, and offering to give the defendant credit therefor on any amount which may be recovered against him, a claim that the complainant has not returned or offered to return the money paid to his guardian has no merit.

4. EQUITY JURISDICTION—*Impeachment of Orders of a Probate Court*

*on Account of Fraud.*—The question whether an order of a Probate Court was procured by fraud and imposition on the court can not be raised in an action at law, but is purely cognizable in equity, and the rule that a party to an action at law must avail himself of such defenses as he may have, applies only to strictly legal defenses.

5. JUDGMENTS—*When the Collection of, May be Enjoined.*—A party sued at law, having a defense of which he does not know, or of which he can not avail himself at law, either for the reason that it is purely equitable in its nature, or because by the rules of law he can not avail himself of it, may enjoin the judgment by bill in equity.

6. ESTOPPEL—*The Law of, Held Inapplicable to the Circumstances of this Case.*—In a suit in equity to impeach a settlement it was urged that the complainant was estopped to question the good faith of the settlement by having brought suit against a former guardian for the recovery of the money paid under the terms of the settlement. It appeared that the suit had been dismissed and that the defendants had not been induced to do or omit to do anything by reason of the suit. *Held,* that the principles of the law of estoppel could not be invoked.

**Bill,** to impeach a settlement. Appeal from the Superior Court of Cook County; the Hon. HENRY V. FREEMAN, Judge, presiding. Heard in this court at the October term, 1897. Affirmed. Opinion filed March 24, 1898.

WALKER & EDDY, attorneys for appellants.

ROSENTHAL, KURZ & HIRSCHL, attorneys for appellee.

MR. PRESIDING JUSTICE ADAMS DELIVERED THE OPINION OF THE COURT.

This was a bill filed March 19, 1895, by appellee, to set aside an order of the Probate Court of Cook County, a release executed by one John Kraus, formerly guardian of appellee, to appellants, and a judgment of the Circuit Court of Cook County, in favor of appellants, in which they were defendants and appellee was plaintiff. The court granted a decree as prayed by the bill. October 23, 1890, appellee sued appellants in the Circuit Court for negligence, by reason of which he alleges his arm was crushed and had to be amputated near the shoulder. M. E. Ames was plaintiff's attorney in the suit, and shortly before bringing suit he wrote to appellants in relation to a settlement of appellee's

claim, and they referred him to their attorneys.   Mr. Ames saw one of appellants' attorneys, who offered him $300 or $350 in settlement of the claim, which he refused, and suit was commenced.   October 30, 1890, while said suit was pending, appellee, who was then about eighteen years and eight months old, appeared in the Probate Court and filed a petition, verified by his affidavit, representing that John Kraus was a suitable person to be appointed his guardian, and praying his appointment, and Kraus, who was present and consented to the appointment, was appointed by the court on his executing a bond with sureties in the penal sum of $1,000, and letters of guardianship immediately issued to said John Kraus.   On the same day, Kraus, as guardian of appellee, filed a petition which, and the order made on the same, are as follows:

"State of Illinois, } ss. In Probate Court.
  County of Cook, }

In re Estate of Frank Betlejewski, }
  a minor, John Kraus, guardian. }

To the Honorable Christian C. Kohlsaat, Judge of said Court.

Your orator, John Kraus, guardian of said Frank Betlejewski, a minor, respectfully represents that the entire estate of his said ward consists of his wearing apparel, not sufficient for the season, and a claim against John Featherstone, George Featherstone and Arthur J. Featherstone, doing business as John Featherstone's Sons, for damages and injury occurring to said ward while said ward was working in a machine shop in Chicago, for Featherstone's Sons, whereby said Frank Betlejewski lost his right arm.   That as your orator is informed and believes, the injury occurred without the fault of any one, and he is advised and believes there is no legal liability therefor on the part of said Featherstones or of any other person, but that his ward was simply unfortunate in being the victim of a risk he took in the course of his employment.   That his ward has incurred expense and loss of time in consequence thereof amounting

to about two hundred to three hundred dollars, and that said Featherstones offered to pay to your orator for account of said ward as a present, without acknowledging any liability whatever, a portion of his said loss.

" And your orator recommends that said proposition be accepted, and that he be authorized to accept not less than one hundred and fifty dollars, besides providing for the costs of this guardianship, say not less than two hundred dollars in all, and to settle and compromise the said claim with said Featherstones upon the best terms he can make, not less than two hundred dollars. And that this petition may stand and be accepted as well for the inventory of said estate.

JOHN KRAUS."

" STATE OF ILLINOIS,   } ss.
  County of Cook.   }

John Kraus, being sworn, says the foregoing petition by him subscribed is true as he believes.

JOHN KRAUS.

Subscribed and sworn to before me this 30th day of October, A. D. 1890.

THOMAS W. SENNOTT, Clerk.

I have carefully examined the facts in the above petition and recommend that said guardian be authorized to compromise and settle said claim vs. the Featherstones for not less than two hundred dollars.

H. D. PAUL,<br>Attorney at Law.<br>FRANK BETLEJEWSKI."

" STATE OF ILLINOIS,   } ss.
  County of Cook.   }

Be it remembered, that on the thirtieth day of October, A. D. 1890, the same being one of the days of the October term, 1890, of the Probate Court of Cook County, present thereat,

HONORABLE CHRISTIAN C. KOHLSAAT, Judge,<br>JAMES H. GILBERT, Sheriff,<br>ROGER C. SULLIVAN, Clerk,

the following, among other proceedings, were by and before said court had, and entered of record, to wit:

In the matter of the guardian-⎫
ship of FRANK BETLEJEWSKI, a ⎬
minor.                        ⎭

This day came John Kraus, guardian of Frank Betlejewski, a minor, and presented to the court his petition, duly verified, showing that among the assets of the estate of said minor there is a claim for damages against John Featherstone, George Featherstone and Arthur J. Featherstone, doing business as John Featherstone's Sons, for negligence, whereby certain injuries were done to said ward which caused the loss of his right arm; that he has employed competent counsel and has fully investigated all the circumstances connected with the accident by which said injuries were caused; that said claim is of a doubtful character, and that said John Featherstone, George Featherstone and Arthur J. Featherstone, doing business as John Featherstone's Sons, have offered to pay him as guardian of said minor the sum of two hundred dollars in full settlement of said claim; that he believes it to be for the best interests of said ward's estate to compromise said claim, and praying for leave to so compromise the same. And it appearing to the court to be for the best interest of said ward's estate to so settle and compromise said claim, and that upon the payment to him by said John Featherstone, George Featherstone and Arthur J. Featherstone, doing business as John Featherstone's Sons, of a sum not less than two hundred dollars, he execute and deliver to them a full written release and discharge from all liability on account of said claim for causing said injuries to said ward."

John Kraus executed to appellants an instrument of which the following is a copy :

" I, John Kraus, having been duly appointed guardian of Frank Betlejewski, minor, and duly authorized to settle and compound claim of said Frank Betlejewski against John, George and Arthur Featherstone, doing business as John Featherstone's Sons, arising from personal injury, for the sum of not less than two hundred dollars net, by order of Probate Court of Cook County, duly entered October 30,

1890, I hereby acknowledge the receipt of three hundred and fifty dollars from said John Featherstone's Sons in full satisfaction of all claims said Frank Betlejewski has or may have against said John, George and Arthur J. Featherstone, or either of them, of every nature whatsoever, and release and discharge them in full.

John Kraus."

Dated October 31, 1890.

February 14, 1891, the Probate Court, by order of that date, set aside the order of October 30, 1890, which authorized the guardian to settle appellee's claim with appellants, without notice to appellants or any appearance by them or their attorneys, and without their knowledge.

March 21, 1893, the suit against appellants commenced; October 23, 1890, it was called for trial.

It seems that appellants had pleaded the order of the Probate Court authorizing a settlement and the release, and that the court, after hearing a statement of the defense from counsel, held that the release could not be attacked at law, and instructed the jury to find the defendants not guilty, and a verdict was entered and judgment rendered accordingly. Mr. Crews, who appeared for appellee, the plaintiff in the case, testified that " Judge Clifford's ruling was based upon the proposition that the settlement was a bar and could not be attacked in an action at law; that the case was not disposed of on its merits." Appellee prayed an appeal, which was allowed but not perfected. Kraus received $350 on the settlement with appellants, of which he paid to appellee only $150, and June 27, 1894, appellee commenced an action against Kraus and the sureties on his bond as guardian, for the balance of the $350 retained by Kraus, and in his declaration he set forth the appointment of Kraus as guardian, the settlement of the claim against appellants, and that the same was settled in pursuance of an order of the Probate Court, etc. The defendants pleaded the general issue, and the suit was dismissed November 11, 1895, for want of prosecution. March 21, 1893, when the judgment was rendered in the Circuit Court, appellee was twenty-

Featherstone v. Betlejewski.

one years, four months old, and June 27, 1894, when he commenced the suit against Kraus and his sureties he was twenty-two years, four months and some days old.

February 15, 1895, appellee commenced an action against appellants in the Superior Court of Cook County, the cause of action stated in his declaration being the same stated in his former action at law in the Circuit Court and in his bill in the present case. Appellants have pleaded in the last mentioned action the general issue, and have also pleaded specially the release and the former judgment of the Circuit Court. The object of the bill is to prevent the appellants from setting up the defense so specially pleaded. Thus far the facts stated are uncontroverted. The court, in entering the decree appealed from, must have found that the appellee had a claim against appellants which should be submitted for trial in the action at law; that the Probate Court was imposed on and deceived into entering the order of October 30, 1890, and that the settlement was in fraud of appellee's rights and was effected by collusion between appellee's guardian, John Kraus, and appellants. The question is whether this finding is contrary to the evidence. The evidence, aside from the documentary evidence heretofore referred to, consists of the testimony of witnesses sworn and examined in open court on the hearing. John Pattan, a witness for appellee, testified that he worked at the place of appellants November 16, 1890, and was employed in raising a column of an ice machine which weighed 2,400 pounds, and which had to be raised high enough to get it into a pit, so as to get it under the machine, and that appellee was assisting him to shove the column toward a hole in the floor, where it had to be lowered. It seems the column was suspended by a chain, the usual appliances for such purpose being used. He describes the accident as follows:

" We were back to back when we were shoving the column in to enter the pit so we could let it down, and I said to the man on the chain to lower it when Frank and I shove it in so I would have it far enough in to enter, and let it

down. It had to come down five feet eight inches. Just as we had it over the hole, I hollered, 'lower,' and he started to lower, and just as he started to lower, the chain on the tackle was loose and slipped and the weight of the casting turned the hook from the chain around the column, and it came down, and there was a guide sticking out on that column about seven or eight inches, and when it came down the guide was facing us. When it came down, of course our strength—shoving the casting into the pit—we went with it. Frank caught his arm. It got between the floor and the casting and the casting struck me on the head and caught my elbow here, but didn't hurt me, for I happened to throw my hand on the floor and it saved me from going head-first in. Frank got up before me. I had quite a little time getting up. When I got up I saw him standing there with his arm off, just hanging by his 'jumper.'" Describing the cause of the accident, he says: "There is a hook attached to each end of this chain. On one end the chain runs over the two rollers—that is, the two cog-wheels the chain runs in—and as it runs over, it catches in and goes down, and where this chain runs it was worn so that when that tackle had a heavy load on, it used to slip and hang by one chain, and the other chain on the tackle would be free, and I told the foreman, Ramsey, about it about a month or two months before ever this happened, that that was dangerous and would come down some day and kill somebody, and I was not going to work under it much longer. I wanted them to put double bolts on it. He said he would. I had told them several times about it; that it was dangerous on account of that tackle slipping."

Appellee testified that he had a conversation with appellants' attorney shortly before bringing the first suit, and was offered $350 by way of settlement; that he talked with his father about it, who said it was too little, and that when he returned to his boarding house he met Kraus, who boarded at the same place where he did, and told him of the offer and its refusal. Kraus' business, as testified by one of the witnesses and not contradicted, was mainly the

Featherstone v. Betlejewski.

looking up personal injury claims, taking them to attorneys, following them to judgment or settlement, and making what he could out of them. When appellee told Kraus of the offer and its refusal, the latter said, " We want now a good lawyer, to place the case in an attorney's hands." Kraus subsequently brought M. E. Ames, an attorney, to appellee, and the evidence shows he was engaged for appellee. An offer, as heretofore stated, was made by appellants to Ames of $300 or $350 in settlement of the claim, which offer was refused, and Ames, October 23, 1890, brought suit. Kraus, after the suit was brought, without consultation with Ames, and without his knowledge, took appellee to one Paul, who testified that he is a lawyer, and asked Paul what was necessary to be done to get a settlement, and Paul advised him that it would be necessary for appellee to have a guardian appointed. Paul says that after some days they came back to his office and said that Kraus would act as guardian and would give the bond.

The next occurrence of which we have knowledge, is the appointment, October 30, 1890, of John Kraus as appellee's guardian, and the issuance of the letters of guardianship. It is contended by appellee, that in the interval between the appointment of Kraus as guardian and the presentation to the Probate Court of Kraus' petition for authority to settle appellee's claim, or at least, before that petition was presented to the court, or authority to settle given, the alleged settlement was made. We next find Kraus, Paul and appellee, between two and three o'clock P. M., in a basement saloon at the corner of Randolph and La Salle streets, in the city of Chicago. Kraus at the time had received from appellants' attorney a check, presumably that of appellants, for $350, and had had it cashed, and had the money in his possession. Appellee testifies that Kraus and Paul then urged him to sign a paper, and gave him a blank piece of paper and a pencil to try if he could write; that he did not know how to move the pencil with his left hand; that they said the paper was a receipt for $150, and that they would not give him the $150 unless he signed; but that, he per-

sisting in his refusal, Paul said, " We will have to sign it ourselves," and he, Paul, signed it; that then they paid him the $150, and Kraus said, "If the case comes up, you will have a little money." Kraus testified that he paid to appellee $150, to Paul $50, to the bondsmen $10, and paid the court costs, and kept the balance, about $120, himself. The evidence shows that the paper which they tried to get appellee to sign in the basement saloon, just before Kraus gave him the $150, was Kraus' petition, as guardian, for leave from the court to settle the claim. Appellee so testified, and Kraus, evidently endeavoring to evade questions in respect to the paper, finally yielded to persistent examination, and corroborated appellee's testimony as to the identity of the paper. In his examination the petition for leave to settle appellee's claim was shown to him, and the following questions were asked and answers given :

Q. " Where was this paper when you gave the boy the $150; where was that paper at that time—in your pocket ? " A. " The time I gave the boy $150 ? "

Q. " Yes, sir." A. " Well, I guess so."

Q. " You showed it to him, didn't you, when you gave him the $150." A. " Yes, sir."

After the witness had testified, in answer to a number of questions, that appellee did not refuse to sign in the saloon, the examination proceeded as follows :

Q. " Did Paul ask him to sign that paper in that saloon ? Don't you know first the boy said he wouldn't, and then Paul explained, and then the boy said he would sign ? " A. " No, sir."

Q. " What was it ? " A. " That is what I say. We asked him to sign any paper and the boy would sign it."

Q. " What about this particular paper in that saloon ? " A. " Paul asked him to sign it for the amount of money, and he signed it; that is the receipt; I don't know when this paper was signed; I think maybe this paper been signed in the Probate Court."

The Court: " Do you know anything about the boy's name that appears on this paper—how it came there ? " A. " Yes, sir."

Q.   "Show it to him."   A.   "When he explained what paper it is then I will read the paper from top.   Explain to me what it is and I will tell you."

Mr. Hirschl:   "Do you know how that writing came there—Frank Betlejewski?"   A.   "I would like to know whether this paper been signed—Paul write with one hand, and the boy couldn't write with left hand, but the boy hold the pen with left hand, and Paul write."

Q.   "That was in the saloon when you had this paper in your pocket?   You had the money there—that is what you said?"   A.   "One paper been signed in the saloon."

The Court:   "Was that paper signed there?   Did you see that name put on there?"   A.   "I don't know what paper is this."

Q.   "Look at the name there."   A.   "I only like to know—"

Q.   "Do you remember whether you saw it or not? Look at the name down below."   A.   "I like to know what the whole paper was, so I just know what this paper means.   Yes, I been have that paper in my name."

Q.   "Do you know when that boy's name was put on there?"   A.   "Yes."

Q.   "When and where?"   A.   "That is receipt been given."

Q.   "I don't ask you that.   Tell me when your name was put on that paper?"   A.   That name was signed when he was getting the money."

Q.   "Who signed it?"   A.   "Paul write one hand and boy hold pen with left hand."

Q.   "That was done at that time?"   A.   "Yes, sir."

It will be observed that the witness persisted in calling the document a receipt.   No receipt signed by appellee was offered in evidence.

This evidence shows conclusively that the paper which Kraus had in the saloon, and which he and Paul were urging appellee to sign, was the petition presented by Kraus to the Probate Court for leave to settle the claim, and on which appellee's name appeared when it was presented to the

court. The inference seems irresistible that prior to the meeting in the saloon, and prior to the presentation of the petition to the court, and, consequently, prior to any authority of Kraus to settle the claim with appellants, he had been furnished by appellants with money to procure a settlement with appellee. His own testimony is, that prior to the meeting in the saloon, he had received and cashed the $350 check. This check was not produced or put in evidence. The petition itself has earmarks of fraud. It is not even the production of ingenious villainy. This, perhaps, was inevitable. The dishonest may possibly assume the garb and outward show of honesty, but not the character. The ass may don the lion's skin, but can not counterfeit the lion's roar, and his bray will betray him.

The petition avers: " That, as your orator is informed and believes, the injury occurred without the fault of any one, and he is advised and believes there is no liability therefor on the part of said Featherstones or any other person, but that his ward was simply unfortunate in being the victim of the risk he took in the course of his employment." Where did Kraus get the information that appellee's injury was occasioned by an assumed danger, and that appellants were not legally liable? Certainly not from appellee or his father, because they claimed that appellants were liable, and had refused $350 in settlement, as Kraus knew. Did Ames so inform him? Clearly not, because Ames had been offered and had refused $350 in settlement, and had commenced suit, as Kraus must have known. Where, then, did he get this information? From whom, if not from appellants, who, and their attorneys, alone claimed non-liability. Manifestly, the petition was not framed in the interest of appellee.

The petition proceeds thus: " That his ward has incurred expense and loss of time in consequence thereof, amounting to about two hundred to three hundred dollars, and that said Featherstones' offer to pay to your orator for account of said ward, as a present, without acknowledging any liability whatever, a portion of said loss." Appellants' learned

attorneys could not frame allegations more effective than these to exclude even the appearance of acknowledgment of liability, and at the same time to extol the generosity of their clients. But the part of the petition in which Kraus had the greatest personal interest is the conclusion, which is as follows :

"And your orator recommends that said proposition be accepted, and that he be authorized to accept not less than one hundred and fifty dollars, besides providing for the costs of this guardianship, say not less than two hundred dollars in all, and to settle and compromise the said claim with said Featherstones upon the best terms he can make, not less than two hundred dollars," etc.

This false and deceptive petition was sworn to by the unscrupulous Kraus. A petition which asks the court for authority to do that which the petitioner had, as he supposed, irrevocably done without authority. The conclusion of the petition is corroborative of the evidence as to what transpired in the saloon, and also exposes the previous scheme. He asks the court for permission to settle for not less than one hundred and fifty dollars, the amount he had paid to appellee, besides providing for the costs of this guardianship, say not less than two hundred dollars in all. He clearly intended by the petition to have the court believe that $50 would be sufficient to pay all the costs of guardianship, including his compensation as guardian, while he had already appropriated $120, and, if subsequently called on for a report of his guardianship, he could report $200 received from appellants, $150 paid to appellee, and the remainder exhausted in paying the costs of guardianship, when, having successfully hoodwinked the court, the record would enable him, with equal success, to defraud his ward. His guardianship of appellee was such as a hungry wolf, assisted by an equally hungry whelp, might exercise over a helpless and unsuspecting lamb. The distribution of the booty justifies the figure, the older wolf taking the larger share. Kraus is evidently one of a class outside the pale of the legal profession, the disreputable coadjutors of another,

if possible, more disreputable class, unfortunately within its pale, who eke out a dishonorable existence by robbing the victims of negligence and miscarriage of the compensation they should receive, who live literally on the price of blood, or, real victims failing, on the fruits of the perjury of simulated victims and suborned witnesses, and whose very existence illustrates not only the wisdom but the necessity of the recent rules of the Supreme Court in regard to admissions to the bar. It is needless to say that these remarks have no application to any honorable member of the bar who espouses the cause of a needy client for a reasonable compensation, depending on a successful result, and who guards the interest of his client as if it were his own, who lives by his practice and not by his practices.

If appellee lost his arm by reason of the negligence of appellants, as averred in the bill, the gross inadequacy of the amount for which his claim is alleged to have been settled, is a circumstance material to the inquiry whether the settlement was procured by fraud. 10 Am. & Eng. Ency., 329 *et seq.*, and cases cited in notes.

" When the witnesses are produced and examined in open court, the finding of the court will not be disturbed unless the finding is manifestly and clearly against the evidence." Miltimore v. Ferry, 171 Ill. 219.

The finding of the court in the present case is not manifestly and clearly against the evidence.

It is objected that appellee has not returned, or offered to return, the money paid to his guardian. The bill avers, and it is not denied by the answer, that appellee long since expended for the necessaries of life the money paid to him, and that he has no means whatever to tender back said sum, but is willing that appellants may have credit for said sum on any amount which, eventually, he may recover against them.

In Brandon et al. v. Brown, 106 Ill. 526, the court say: " We have repeatedly held that when a minor disapproves a judicial sale bill in equity, he must return, or offer to return, what he has received if it be in his power. When he

has, during his minority, wasted or squandered it, this is not required," etc.

In Reynolds v. McCurry et al., 100 Ill. 361, is the following: " But even when one has personally enjoyed the benefit of the consideration for a conveyance of land while a minor, he is not bound in every case to restore the consideration before he is permitted to avoid his deed.   The general rule is, that when the consideration of a conveyance by an infant has been expended so that he is not in a condition to restore it, he may nevertheless avoid the consequence. It is only when he still has the consideration, that he will be compelled to return it.   1 Wait's Actions and Defenses, 142.   Any other rule would leave thoughtless, extravagant young persons at the mercy of sharpers and land sharks."

To the same effect are the following cases:  Miller v. Smith, 26 Minn. 248; St. Louis, I. M. & S. Railway Co. v. Higgins, 44 Ark. 293; Carpenter v. Carpenter, 45 Ind. 142; Green v. Green, 69 N. Y. 553; Commonwealth v. Johns, 6 Gray, 274; Chandler v. Simmons, 97 Mass. 514; Walsh v. Young, 110 Mass. 396; Boody v. McKenney, 23 Me. 517, 525; Price v. Furman, 27 Vt. 271; Bennett v. McLaughlin, 13 Ill. App. 349.

Appellants' counsel further contend that appellee having failed to avail in the action at law of the objections now made to the order of the Probate Court authorizing the settlement, and to the release, a court of chancery will not set aside the judgment of the Circuit Court in that action. This might be true, if the objections were such that the appellee could have availed of them in the common law action, but the appellee could not, in that action, attack the settlement and the release, without attacking the order of the Probate Court authorizing the release.   The settlement purports to have been judicial in its nature, and appellants so claim.   Their answer to appellee's bill contains the following:

" Respondents further aver that said settlement was duly authorized by the Probate Court of Cook County, and approved by said Probate Court, and respondents deny that

there was any imposition upon said court." The question whether the order of the Probate Court was procured by fraud and imposition on the court, could not have been raised in the action at law, as the trial court held, and is purely cognizable in equity. The rule that a party to an action at law must avail himself of such defenses as he may have, applies only to strictly legal defenses. Vennum v. Davis et al., 35 Ill. 568; Palmer v. Bethard et al., 66 Ill. 529; Gregg v. Brower, 67 Ill. 525.

"A party sued at law, having a defense of which he does not know, or of which he can not avail himself at law, either for the reason that *it is purely equitable in its nature,* or because by the rules of law he can not avail himself of it, may enjoin the judgment by bill in equity." Chicago & E. I. R. R. Co. v. Hay et al., 119 Ill. 504.

It is objected that appellee is estopped to question the good faith of the settlement, by having brought suit against Kraus and the sureties on his bond as guardian, for the recovery of the money retained by Kraus. That suit was dismissed. Appellants were not induced to do or omit to do anything by reason of the suit. Under these circumstances we can not perceive how the principle of the law of estoppel can be invoked by appellants.

The decree will be affirmed.